IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM ROBERT SANDERS, # 258188, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:15cv779-WKW |
| | ) | (WO) |
| LEON FORNISS, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

This matter is before the court on a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254 filed by Alabama inmate William Robert Sanders ("Sanders"). Doc. No. 1.[1] Sanders challenges his 2008 guilty plea conviction for solicitation to commit murder and his 20-year sentence entered by the Circuit Court of Montgomery County. He argues that he was not mentally competent to enter his guilty plea. For the reasons that follow, the undersigned recommends that Sanders's § 2254 petition be denied without an evidentiary hearing and that this case be dismissed with prejudice.

## I.    BACKGROUND

### A.    Indictment and Arraignment

In November 2005, a Montgomery County grand jury indicted Sanders on charges of conspiracy to commit murder, in violation of §§ 13A-4-1 & 13A-6-2, Ala. Code 1975,

---

[1] References to "Doc. No(s)." are to the document numbers of the pleadings, motions, and other materials in the court file, as compiled and designated on the docket sheet by the Clerk of Court. Unless otherwise noted, pinpoint citations are to the page of the electronically filed document in the court's CM/ECF filing system, which may not correspond to pagination on the "hard copy" of the document presented for filing.

and solicitation to commit murder, in violation of §§ 13A-4-3 & 13A-6-2, Ala. Code 1975 (1975). *See* Doc. No. 15-1 at 21–24. The charges were related to Sanders's alleged scheme to hire Ossie Sanders and Bernetta Carter to kill David Hataway, Sanders's ex son-in-law. *Id*.; Doc. No. 21-2 at 2; Doc. No. 15-7 at 8–12. Sanders was arrested before the murder could be carried out. Doc. No. 21-2 at 2; Doc. No. 15-7 at 12.

At his November 2005 arraignment, Sanders entered pleas of not guilty and not guilty by reason of mental disease or defect, after which the trial court ordered that Sanders undergo a psychological evaluation of his competency at the time of the offense and his competency to stand trial. Doc. No. 15-1 at 24; Doc. No. 15-16 at 32–35.

**B.     Initial Psychological and Neurological Evaluations**

In February 2006, Dr. Glen King, a certified forensic examiner with Clinical Psychologists PC in Montgomery, evaluated Sanders at the jail where he was being held. Doc. No. 15-16 at 55–56. Dr. King filed a report with the trial court which diagnosed Sanders with dementia associated with Alzheimer's disease and indicated that Sanders, as a result, might have significant memory difficulties interfering with his ability to assist his counsel in his own defense. *Id*. Dr. King recommended that Sanders not be allowed to proceed with disposition of the charges against him until his intellectual functioning was further evaluated. *Id*. He also recommended that Sanders undergo evaluation to determine if he could regain competency. Doc. No. 25-1 at 4.

Based on Dr. King's diagnosis and report, the trial court ordered a battery of neurological testing of Sanders, including a PET scan. Doc. No. 15-16 at 72–73. Results of the PET scan indicated that Sanders had "diminished metabolic activity throughout the

temporal, parietal, and occipital lobes and the cerebellum, consistent with fairly advanced Alzheimer's disease." *Id.* at 73; *see* Doc. No. 15-16 at 65.

### C.     First Competency Hearing and Trial Court's Orders

On March 27, 2007, a brief hearing was held on Sanders's competency to stand trial.[2]  Doc. No. 25-1 at 1–11.  At that hearing, Dr. King reaffirmed his diagnosis that Sanders was suffering from dementia. *Id.* at 5.  Dr. King stated that he believed Sanders's ability to participate in the legal proceedings against him was "spotty" and that Sanders "had some critical deficits in certain areas." *Id.* at 6.  He offered the opinion that Sanders was not competent to stand trial, although he could not say this with absolute certainty. *Id.* Accordingly, he recommended that Sanders undergo lengthy review and observation by the Alabama Department of Mental Health ("ADMH"). *Id*.

Following the March 27, 2007 hearing, the trial court entered an order finding Sanders had a mental defect preventing him from assisting his attorneys in his own defense and was incompetent to proceed to trial at that time. Doc. No. 15-16 at 73.  The court found there was need for further evaluation of Sanders to determine whether he might become competent "within a reasonable period of time." *Id*.  The court ordered that Sanders be evaluated by the ADMH at the Taylor Hardin Secure Medical Facility in Tuscaloosa ("Taylor Hardin"), "to determine whether it is feasible and/or worthwhile to initiate training designed to increase defendant's knowledge of courtroom procedures and improve his ability to assist his attorney in his own defense." *Id*. at 73–74.

---

[2] The record evidence regarding the psychological and neurological evaluations of Sanders for the most part concerns Sanders's competency to stand trial, as opposed to his competency at the time of the offense.

3

Sanders underwent evaluation at Taylor Hardin. On July 12, 2007, after reviewing initial mental and medical reports from Taylor Hardin, the trial court found that Sanders needed additional and closely monitored evaluation, treatment, and competency training. Doc. No. 15-16 at 79. Under Rule 11.3(b) of the Alabama Rules of Criminal Procedure,[3] the trial court ordered that Sanders be committed to the ADMH "for a reasonable period of time necessary to conduct further evaluation by a psychologist or psychiatrist as to whether the defendant has sufficient present ability to assist in his own defense, by consulting with counsel, with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant and as to the defendant's mental state at the time of the alleged offense(s)." *Id.*

**D.     Final Competency Hearing**

---

[3] Rule 11.3(b) of the Alabama Rules of Criminal Procedure provides:

> The circuit court may order that a defendant be examined in a state institution, and it may commit a defendant to the Department of Mental Health and Mental Retardation for a reasonable period of time necessary to conduct the examination if
>
>> (1) the defendant cannot be examined on an out-patient basis; or
>>
>> (2) examination in an out-patient setting is unavailable; or
>>
>> (3) the appointed examiner reports that confinement for evaluation is indispensable to a clinically valid diagnosis and report.
>
> Provided, however, that a court may not order a defendant committed to the Department of Mental Health and Mental Retardation for a time longer than that reasonably necessary to conduct the examination.

Ala.R.Crim.P. 11.3(b).

4

On January 22, 2008, a final hearing was held on Sanders's competency to stand trial. *See* Doc. No. 25-2 at 2-77. At the hearing, the trial court heard testimony (both live and by telephone) from several doctors who evaluated Sanders regarding his competency.

### Dr. Larry Epperson

Dr. Larry Epperson, a neurologist presented by the defense, testified about his evaluation of Sanders in October 2006 (approximately fifteen months before the final competency hearing). That evaluation included a question-and-answer memory test ("the Mini-Mental State Examination"), blood work, and various brain scans. *Id*. at 4-15. Dr. Epperson stated that Sanders scored below average on the Mini-Mental State Examination, indicating Sanders had cognitive problems, but he acknowledged it was possible for someone to malinger on this test. *Id*. at 4 & 12–14. Dr. Epperson testified that Sanders's brain scans revealed physical conditions, including atrophy and atherosclerosis, consistent with "an Alzheimer's type of dementia." *Id*. at 6–7. He stated that the results of such brain scans are objective and not susceptible to being faked. *Id*. at 7. Dr. Epperson testified that the cognitive problems stemming from dementia could worsen progressively over several years. *Id*. at 8–10. He stated such cognitive problems might vary from day to day, and individuals with dementia could experience fluctuations in their lucidity. *Id.* at 10–11. When asked his opinion on whether Sanders could assist his counsel in his defense and whether Sanders was competent to stand trial, Dr. Epperson answered that Sanders had "some serious cognitive problems" that would make it difficult for him to assist in his defense. *Id.* at 7–8. Dr. Epperson acknowledged he had not previously performed any evaluations of defendants' competency to stand trial. *Id.* at 14.

### Dr. Glen King

Dr. Glen King also testified on behalf of the defense at the January 22, 2008 hearing. It was Dr. King's opinion that Sanders was not malingering during the memory tests administered to him by Dr. Epperson. *Id*. at 38–40. Dr. King stood by his original diagnosis that Sanders was suffering from dementia. *Id.* While he thought Sanders understood the charges against him and possessed a reasonable understanding of the roles of the participants in the criminal proceedings, Dr. King stated he remained concerned about Sanders's "memory issues" in terms of his ability to consult with his attorneys. *Id*. at 37–38 & 41.

### Dr. Russ Bates

Dr. Russ Bates, an internal medicine physician in charge of Sanders's care at the county jail after his arrest, testified on behalf of the State at the January 22, 2008 hearing. Dr. Bates stated that neither he nor the nursing staff at the jail saw Sanders exhibit any characteristics of Alzheimer's disease, including problems with short-term memory. *Id.* at 21–22 & 26. Dr. Bates testified that, while at the jail, Sanders was initially taking Aricept, an Alzheimer's medication prescribed for him by doctors at Taylor Hardin. *Id*. at 19–21. Dr. Bates stopped administering Aricept to Sanders. *Id.* at 21. Dr. Bates testified that Sanders told his wife during a jail visit that he had stopped receiving Aricept. *Id*. at 21. According to Dr. Bates, a person with Alzheimer's disease, especially advanced Alzheimer's disease, would typically have such a diminished short-term memory that he would not remember to tell someone his medication has been stopped. *Id*. Dr. Bates testified that the results of Sanders's brain scans did not sway his opinion regarding

6

Sanders's mental faculties, because many people have organic brain abnormalities while still functioning normally. *Id*. at 22 & 26. It was Dr. Bates's opinion that Sanders did not have Alzheimer's disease. *Id*. at 23. Dr. Bates acknowledged that he conducted no formal verbal and memory testing of Sanders at the jail. *Id*. at 24–25.

Dr. James F. Hooper

Also testifying on behalf of the State at the January 22, 2008 hearing was Dr. James F. Hooper, medical director at Taylor Hardin and a board-certified forensic psychiatrist. Dr. Hooper testified regarding four separate examinations of Sanders conducted at Taylor Hardin during October and November 2007, including a detailed neurological exam conducted on November 8, 2007. The pertinent part of Dr. Hooper's testimony is quoted here at length:

> The issue with this man has been raised largely based on scans and MRIs; however, they also did an EEG, which was normal.
>
> . . . .
>
> Well, the scans show you a picture. Okay. The MRI shows you a picture. If you took a picture of my leg now and compared it to my leg when I was 20, it would show atrophy. My leg is not as big and strong as it was when I was a young man. I can still walk, however, and the fact that my leg is smaller means probably I can't walk as far. But it still functions.
>
> The EEG measures the global functioning of the brain, which was normal.
>
> Everything that we did with Mr. Sanders was either inconsistent or grossly normal. When I went through the sub-types of Alzheimer's—because he came to us with a diagnosis of Alzheimer's. He says he doesn't remember things. I mean, you know, it's sort of like Dr. King said. That's where you start is thinking, okay, what do we do to evaluate this.

He was already on Aricept. We didn't have a whole lot to do more to treat that, so we just wanted to clarify whether that was an accurate diagnosis or not. Mr. Sanders continued to exhibit no problems with short-term memory. His difficulties were primarily not being able to remember the things that had to do with the index crime and not being able to remember anything when he was formally tested. But in terms of activities in the program, remembering who the staff were, functioning within the hospital environment, he had no problems.

So I went through all of the criteria for the various types of Alzheimer's, and it's in my report. And I've got—I don't know that I can quote it off the top of my head. But, basically, for Alzheimer's dementia, you need some specific things, and we specifically tested for those things, and he didn't have any of them. So I said Alzheimer's is not the diagnosis.

For Lewy Body dementia, it's a rare type of dementia, and people are really, really disorganized and nonfunctional, and that clearly wasn't Mr. Sanders.

For a vascular-type dementia, there are criteria that he didn't meet as well.

And then there is a frontotemporal type of dementia where, basically, you're having mini strokes in the frontal regions of the brain. Well, he's got a PET scan that shows some diminished function there, and it shows—it talks about some slowing of things like ability to conform your behavior, you know, executive functioning. And I said, well, maybe this is what's going on with this man.

Well, on a neurological exam, a person with that kind of dementia should have what are called frontal release sides, and those are specific neurological things that are somewhat bizarre. Okay. There is a palmar mental reflex. You stroke somebody's palm and you see a contraction of the mentalis muscle in their chin. And it's very obvious if it's there, and it's pretty hard to fake it. But it would be really hard to fake not having it and especially if somebody is not aware that those things are supposed to be there.

I found no frontal relief signs on Mr. Sanders at all, and I couldn't find anything to support any diagnosis of dementia. We left him on the Aricept. It didn't seem to be hurting anything. Somebody decided he ought to be on it. That didn't seem to be a big issue.

But I could not find any evidence that this man was not competent to stand trial except his statements that he couldn't remember things to talk about. Except when you start questioning him, he can remember this, but he can't remember that. Then if you ask him about that, he can remember it, but he can't remember the first one. And it all boils down to his narrative of what he can and can't remember.

The Mini-Mental Status Exam that they performed, almost everything on that is something that you can voluntarily choose to not do right.

The MRI scan that he had showed more atrophy in his cerebellar regions which would mean motor function, and he should have a great deal more difficulty walking and moving than having cognitive problems.

He has no short-term cognitive problems. He doesn't have any motor function problems.

And so that MRI to me says, yeah, his brain has shrunk. He's 68 years old. It's maybe shrunk a little more than most, but it obviously still functions.

The EEG is normal. The PET scan shows decreased metabolic activity. Now, I don't know and I don't know that anybody knows, you know, exactly how that compares and stacks up to a hundred other people who are 68 years old, but it's not something that really makes any difference.

Just like Dr. Bates said, it's—it doesn't change my opinion. I looked at all of those things to start with, and I started from the position that Dr. King had already seen him, thought he might have dementia, so he got sent to us for more definitive evaluation and treatment.

Dr. [Epperson] had written a report saying he's done it. But as you pointed out, Dr. [Epperson] is not a forensic neurologist, and his statement that somebody is competent to stand trial is—or incompetent to stand trial is based on no training. I mean, I would bet that if you had asked him what the criteria for competency were, he wouldn't know them. It's just sort of his gut feeling that this man is not competent.

What Dr. Bates was talking about is where he's seen this man over several months in the jail, obviously, not very much, and he's relying a lot on secondary people. Well, what we do at Taylor Hardin is sort of a full-court press in the same direction, because everybody there is trained to look at exactly those kind of things. And we're doing it 24 hours a day, Q-15 minutes, documenting on the chart what this man had done, what's

9

happening.  If he goes down to play basketball, the people playing basketball with him are documenting whether he can or can't.  If he plays cards, we're keeping track of it.

So we have a much better system of gathering the information than the jail has and I would argue than any independent person could do.

So it is my feeling that the final conclusion of my evaluation was that this man is competent if he wants to be.

. . . .

You know, I don't see a patient at Taylor Hardin in an isolated state.  I don't come in and see them for 10 minutes and then don't know anything about them. I've got continuous feedback from all of the staff that works with him all of the time. And the questions that I ask the staff are, specifically, did he have any problems learning where the dining hall was, did he have any trouble remembering your name, you know, and the answer to all of those was no, no, no, no.

And so I'm left with somebody who says he can't remember the events of the crime sort of sometimes, but sometimes can and who told me when he walked in the door, well, I've got Alzheimer's. That's what the report says.  I'm incompetent to stand trial.  I just didn't see it.

Doc. No. 25-2 at 58–65.

It was Dr. Hooper's opinion, "quite strongly," that Sanders was "able to proceed to trial." Doc. No. 25-2 at 72.

At the conclusion of the January 22, 2008 hearing, the trial court stated it was considering appointing an independent expert—"a forensic psychiatrist with training in neurological issues"—to assess Sanders's competency to stand trial, since the opinions of the experts presented by the defense and the State diverged so much.  Doc. No. 25-2 at 78–79.

E.     **Trial Court's Finding of Competency**

The proceedings reconvened on January 31, 2008, with Sanders present in court with his lawyers. *See* Doc. No. 15-7. The prosecutor was also present. *Id*. At the outset of the proceedings, the trial court made these statements on the record:

> Mr. Bailey [prosecutor] and Mr. Keith [defense counsel], we're here on Mr. Sanders. As y'all know, we had a final hearing last week. We've had many experts examine Mr. Sanders related to his competency to stand trial, and the Court has received reports, orally and written, from these doctors. And last week, the Court told the lawyers that if we couldn't agree, that we would get an independent doctor.
>
> The Court does not think that is necessary because the great weight of the evidence supports the State's position that Mr. Sanders is competent to stand trial. And, of course, that comes from the fact that Mr. Sanders spent lots of time at Taylor Hardin, and the doctors there feel like he is competent. And the Court would adopt that, and I think the great weight of the evidence does support that.
>
> So the Court does not—the Court itself does not need any more doctors to examine Mr. Sanders or any other information. The Court has sufficient information to make that determination.

Doc. No. 15-7 at 2–3.

In response to the trial court, Sanders's counsel Mr. Keith stated:

> And, Judge, we have discussed the issue with Mr. Sanders, Mr. Teague [defense co-counsel] and myself have in great detail basically. And I think he understands the situation, the doctors' opinions.
>
> . . .
>
> And after discussing it with Mr. Sanders, it's our opinion and feeling that he does—is competent to understand the proceedings and the nature of the plea and his rights at trial. We've been over all of those rights, and Mr. Sanders agrees that for us basically to withdraw that pursuit of that incompetency plea.

Doc. No. 15-7 at 3.

**F.     Guilty Plea**

At the same January 31, 2008 proceeding, Sanders withdrew his not guilty plea and, under a plea agreement with the State, entered a guilty plea to the charge of solicitation to commit murder.[4] Doc. No. 15-7. A review of the transcript from this proceeding demonstrates that the trial court conducted an extensive plea colloquy with Sanders prior to accepting his guilty plea. *Id*.

On February 21, 2008, the trial court sentenced Sanders to a term of twenty years' imprisonment. Doc. No. 15-8. Sanders pursued no direct appeal.

### G.     First Rule 32 Petition

On February 15, 2011, Sanders, acting *pro se*, filed a petition in the trial court seeking post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure. Doc. No. 15-1 at 6–14. In his Rule 32, petition, Sanders argued that his guilty plea was not knowingly, voluntarily, and intelligently made. *Id*. at 11–12. Specifically, he claimed that the factual basis underlying his guilty plea was insufficient because, prior to his arrest, he renounced his solicitation of others to commit a murder. *Id*. The trial court denied Sanders's Rule 32 petition on May 9, 2011. *Id*. at 38–39. Sanders appealed, and on September 23, 2011, the Alabama Court of Criminal Appeals issued a memorandum opinion affirming the trial court's judgment. Doc. No. 15-5. Sanders did not apply for rehearing in the Alabama Court of Criminal Appeals or seek certiorari review in the Alabama Supreme Court.

### H.     First § 2254 Action

---

[4] The charge of conspiracy to commit murder was nolle prossed. Doc. No. 15-7 at 4.

In December 2011, Sanders filed a 28 U.S.C. § 2254 petition in this court presenting a claim he was actually innocent of solicitation to commit murder because he had renounced his solicitation. Doc. No. 15-9; *see Sanders v. Forniss, et al.*, 2:11cv1035-TMH. In August 2013, Sanders filed an amendment to the § 2254 petition adding a claim that he was mentally incompetent when he entered his 2008 guilty plea. Doc. No. 15-10. In October 2013, this court dismissed Sanders's § 2254 petition without prejudice on the ground that his incompetency claim was unexhausted in the state courts and could still be asserted in a state Rule 32 petition. *See* Doc. Nos. 15-11, 15-12 & 15-13.

**I.      Second Rule 32 Petition**

On December 5, 2013, Sanders filed a *pro se* Rule 32 petition in the trial court (his second) asserting a claim that he was mentally incompetent when he entered his guilty plea. Doc. No. 15-14 at 6–18. On June 13, 2014, the trial court denied the Rule 32 petition on grounds that it was time-barred and successive and Sanders's claim was without merit. *Id*. at 33. Almost ten months later, on April 20, 2015, Sanders filed a notice of appeal. *Id*. at 78–80. On September 21, 2015, the Alabama Court Criminal Appeals dismissed Sanders's appeal as untimely filed. Doc. No. 15-17. Sanders filed a petition for writ of certiorari in the Alabama Supreme Court, which was denied on October 16, 2015. *See* Doc. Nos. 15-18 & 15-19.

**J.      Instant § 2254 Petition**

On October 23, 2015, Sanders initiated the instant habeas action by filing a § 2254 petition asserting the claim that he was mentally incompetent to enter his 2008 guilty plea. Doc. No. 1 at 6–15.

## II. DISCUSSION

### A. Substantive Competency Claims Are Not Subject to Procedural or Time Limitation Bars.

The respondents contend that Sanders's § 2254 petition is time-barred from review because Sanders filed it well after expiration of the one-year limitation period in 28 U.S.C. § 2244(d) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Doc. No. 15 at 16–22. However, the Eleventh Circuit has recognized that a substantive claim challenging a petitioner's competency to stand trial—the sole claim presented in Sander's § 2254 petition—is not subject to procedural or time limitation bars in a federal habeas proceeding. *Medina v. Singletary*, 59 F.3d 1095, 1111 (11th Cir. 1995) (Although petitioner did not raise on direct appeal or in his initial Rule 32 petition a substantive competency claim that he was convicted while incompetent, "his substantive competency claim … is not subject to procedural default [or time limitations] and must be considered on the merits."). *See, e.g., Simon v. Giles*, 2015 WL 1292525, at *4 (M.D. Ala. Mar. 23, 2015). Therefore, Sanders's § 2254 petition is not subject to dismissal on statute of limitation grounds.

### B. Substantive Competency Adjudication by State Court

The trial court adjudicated Sanders's substantive competency claim on the merits prior to Sanders's entry of his January 2008 guilty plea. Doc. No. 15-7 at 2–3. Moreover, one of the grounds for the trial court's denial of Sanders's December 13, 2013 Rule 32 petition, in which Sanders asserted a substantive competency claim, was that Sanders's

claim lacked merit and Sanders had not met his burden of proof.[5] No. 15-14 at 6–18. *Id.* at 33.

To prevail on a claim adjudicated on the merits by the state courts, a § 2254 petitioner must show that a decision by the state courts was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts, in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2); *see Williams v. Taylor*, 529 U.S. 362, 404–05 and 412–13 (2000). A state court's decision is "contrary to" federal law either if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts "materially indistinguishable" from those in a controlling case, but nonetheless reaches a different result. *Williams*, 529 U.S. at 404–06; *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court's decision is an "unreasonable application" of federal law if it either correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or it extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 407.

"Objectively unreasonable" means something more than an "erroneous" or "incorrect" application of clearly established law, and a reviewing federal court may not substitute its judgment for the state court's even if the federal court, in its own independent

---

[5] As reflected in the discussion of the background and procedural history of Sanders's case, Sanders filed no direct appeal from his conviction, and his appeal from the denial of his December 23, 2013 Rule 32 petition was dismissed as untimely filed. Thus, only the trial court has made a merits ruling on Sanders's claim that he was mentally incompetent to enter his 2008 guilty plea.

judgment, disagrees with the state court's decision.  *See Williams*, 529 U.S. at 411; *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).  The reviewing court "must determine what arguments or theories supported or … could have supported[ ] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  "This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 536 U.S. 170, 181 (2011) (internal citations omitted).

     Federal courts are likewise directed to determine whether the state court based its findings on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  A federal court "may not characterize these state-court factual determinations as unreasonable 'merely because [we] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 135 S.Ct. 2269, 2277 (2015) (citation omitted) (alteration in original).  A state court's determination is "presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

     The Due Process Clause of the Fourteenth Amendment prohibits states from trying and convicting defendants who are mentally incompetent.  *See Pate v. Robinson*, 383 U.S. 375 (1966); *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995).  The standard for mental competency to stand trial is "whether [a defendant] has sufficient present ability to

16

consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (internal quotation marks omitted).

> In itself, the mere presence of a mental disease or defect is not sufficient to render a defendant incompetent under the standard set forth in Dusky[.] The disease or defect must be of sufficient magnitude to compromise defendant's mental capacities to the point that he functions below the level established in *Dusky*. This inquiry is a difficult one because it does not follow a bright line rule that any diagnosis of mental disease or defect is enough to demonstrate legal incompetency. The diagnosis of existence must be coupled with evidence of degree, to wit significant impairment. As the Eleventh Circuit explained in a case involving a 74-year old man exhibiting signs of Alzheimer's Disease:
>
>> The district court found that the minor defects in Hogan's cognitive abilities did not render him incapable of providing rational assistance to his attorney. Even perfectly competent defendants often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers. That level of comprehension is not a requirement of competency. All that is required is that Hogan had a rational as well as a factual understanding of the proceedings against him and had sufficient present ability to consult with his attorney with a reasonable degree of rational understanding. We cannot say that the district court clearly erred in finding that he did.
>
> *United States v. Hogan*, 986 F.2d 1364, 1373 (11th Cir.1993).

*United States v. Liberatore*, 856 F. Supp. 358, 360 (N.D. Ohio 1994).

To sustain his claim that he was actually incompetent to stand trial, Sanders must "bring forward facts that 'positively, unequivocally, and clearly generate a real, substantial and legitimate doubt' as to his mental capacity to assist in his trial defense." *Reese v. Wainwright*, 600 F.2d 1085, 1093 (5th Cir. 1979).

Here, the facts known to the trial court at the time of Sanders's guilty plea—based on the court's consideration of the testimony and reports of the various doctors who evaluated Sanders—included the fact that brain scans had revealed diminished metabolic activity in Sanders's temporal, parietal, and occipital lobes and in his cerebellum—conditions consistent with Alzheimer's disease. In addition, Dr. Epperson and Dr. King, medical experts who testified on behalf of the defense at the January 22, 2008 competency hearing, offered the opinion that Sanders suffered from dementia and cognitive problems that would make it difficult for him to assist his lawyers in his own defense. Dr. Epperson testified that Sanders performed below average on a question-and-answer memory test, a performance which Dr. King did not believe resulted from malingering.

On the other hand, Dr. Bates and Dr. Hooper, medical experts called by the State at the competency hearing, gave testimony indicating that Sanders did not appear to suffer from cognitive problems or memory difficulties. Dr. Hooper suggested that Sanders deliberately gave wrong answers on memory tests administered to him and thus was malingering. Dr. Bates testified that the results of Sanders's brain scans did not affect his opinion regarding Sanders's mental faculties, because people may have organic brain abnormalities and still function normally. It was his opinion that Sanders did not have Alzheimer's disease. Dr. Hooper, who evaluated Sanders for an extended period at Taylor Hardin in the months prior to his guilty plea, also believed that Sanders did not have Alzheimer's disease. Consistent with Dr. Bates, Dr. Hooper stated that organic changes in the brain due to aging do not necessarily result in significant problems with cognition and memory. Dr. Hooper stated that, in his evaluation of Sanders, he could find nothing to

support a diagnosis of dementia. It was Dr. Hooper's opinion that Sanders's was mentally competent to stand trial.

Faced with conflicting diagnoses and opinions from the defense and State medical experts, the trial court gave considerable weight to Dr. Hooper's testimony in finding that Sanders was competent to stand trial. The trial court placed particular emphasis on the extensiveness of the evaluation Dr. Hooper performed on Sanders at Taylor Hardin. While Sanders's experts, Dr. Epperson and Dr. King, offered opinions contrary to that of Dr. Hooper (and Dr. Bates), it was not objectively unreasonable for the trial court to credit the expert opinions of Dr. Hooper and Dr. Bates, particularly given the evidence that Dr. Hooper's evaluation of Sanders was the most extensive evaluation conducted by any testifying medical expert in terms of duration and day-to-day observation, and was closest in time to Sanders's entry of his guilty plea.[6] The assessment and conclusions of Dr. Hooper and Dr. Bates presented ample evidence of Sanders's competency to stand trial. The combined testimony of the State's medical experts supports the conclusion that, when Sanders entered his guilty plea, Sanders had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [and] a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402.

Because the trial court's finding of competency was neither contrary to, nor an unreasonable application of, clearly established federal law, and it did not involve an

---

[6] The court notes that Sanders's own lawyers stipulated to his competence before Sanders entered his guilty plea.

unreasonable determination of the facts in light of the evidence presented, Sanders is not entitled to federal habeas relief on this claim.

### III. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the petition for habeas corpus relief under 28 U.S.C. § 2254 filed by Sanders be DENIED and that this case be DISMISSED with prejudice.

It is further ORDERED that the parties shall file any objections to this Recommendation or before June 14, 2018. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered. Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) will bar a party from a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11th Cir. R. 3-1. *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Done, on this the 31st day of May, 2018.

/s/ Susan Russ Walker\
Susan Russ Walker\
United States Magistrate Judge